AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

RAYBAR PTE LTD )
)
)
)
)
*Plaintiff(s)* )
v. ) Civil Action No.
HEALTH SUPPLY US, LLC, a Delaware limited liability )
company )
)
)
*Defendant(s)* )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* HEALTH SUPPLY US, LLC, located at 11126 MORRISON ST UNIT #1 NORTH HOLLYWOOD CA 91601

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: DAVID BERKE, 369 S. Doheny Dr., #508, Beverly Hills, CA 90211,
SBN #123007
email: david@berkeslaw.net
telephone: (310) 251-0700

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: _____   _____
*Signature of Clerk or Deputy Clerk*

David Berke (SBN #123007)
BERKESLAW
369 S. Doheny Drive
Beverly Hills, California 90211
Telephone: (310) 251-0700
Email: david@berkeslaw.net
Attorneys for Plaintiff
Raybar Pte Ltd

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| RAYBAR PTE LTD | CASE NO. |
|---|---|
| Plaintiff, | COMPLAINT FOR DAMAGES FOR: |
| v. | (1) BREACH OF WRITTEN CONTRACT; |
| HEALTH SUPPLY US, LLC, a Delaware limited liability company, | (2) GOODS AND SERVICES RENDERED; and |
| Defendant. | (3) MONEY HAD AND RECEIVED |

Plaintiff Raybar Pte Ltd, and for its Complaint herein, alleges as follows:

## INTRODUCTION

1. At the time of this writing, the world is in the grips of a global pandemic, caused by a novel coronavirus which can cause exposed individuals to contract a disease commonly referred to as "COVID-19." In the United States alone, there have now been some 7.58 million COVID-19 cases recorded, with a death toll now exceeding 212,000. Both numbers are climbing.

2. The effect of the pandemic on the public and the country as a whole has and continues to be dramatic. The economy is in shambles. Unemployment rates are approaching record levels, countless businesses have either been shuttered or are required to operate remotely and, while limitations on ordinary citizens are not universally imposed or followed, millions of

Americans are wearing protective face-masks, quarantining at home, and practicing "social distancing." Traditional group activities such as attendance at major sporting events, concerts and theater-going have either been severly curtailed, or shut down altogether.

3. In response to this threat to the nation's economic and physical well-being, there has been a massive effort aimed first at supplying Personal Protective Equipment ("PPE") to doctors, nurses and First Responders, including items such as surgical-quality masks, gloves, head gear and gowns, as well has copious amounts of hand sanitizer and other cleaning products. Not long after the outbreak was discovered, the demand for PPE expanded exponentially globally and in this country, as the general public rushed to secure of protective items of every description.

4. The distribution and use of PPE is a critical factor in controlling the spread of the virus which causes COVID-19, which scientists believe is airborne in nature, and can thus spread through close personal contact, or hand to mouth transmission following contact with surfaces which have been contaminated by the virus.

5. It is in this effort that Plaintiff Raybar PTE Ltd ("Raybar" or "Plaintiff"), headquartered in the country of Singapore with offices in Viet Nam, has been heavily involved. Thus, for approximately the last six months, Raybar has been engaged as a broker between manufacturers and suppliers of PPE of all varieties, and in particular, surgical gowns. The ongoing demand for disposable surgical gowns (and other PPE) is enormous, and Raybar – which enjoys excellent contacts with major Vietnamese manufacturers -- was excited by the prospect of playing a significant role in this enormously pressing humanitarian undertaking.

6. Introduced through a mutual acquaintance, Raybar became aware of HSUS, which represented itself to be a "major player" in the distribution and sale of PPE, blessed with an enviable list of clients, potential clients, and contacts. The "fit" seemed to be a good one, with Raybar being able to lend its considerable business acumen to HSUS, and thereby connecting manufacturers with suppliers and, ultimately, end users.

7. It was not until much later, however, that Raybar was to learn that HSUS was more or a less a "one-off," a small group of individuals greedily seeking to capitalize on a global catastrophe, without any possessing any of the basic and essential tools required to pull off such

an enormous – and enormously important – enterprise. More than with most products, PPE needs to reach the public, and the medical community especially, both quickly and efficiently. As it turned out, HSUS lacked the means to ensure either speed or efficiency, and Raybar (and its suppliers) paid a very large price for Defendant's ineptitude and misrepresentations.

8. The business relationship between Raybar and HSUS is memorialized in a written agreement dated April 1, 2020 (hereinafter, the "Agreement"), a true and correct copy of which is attached hereto as Exhibit 1, and incorporated herein by this reference. Raybar was to be paid on a commission basis, calculated as Twenty Per Cent (20%) of the difference between what the PPE supplies cost HSUS to secure, and the price at which HSUS then sold the items to its end user customers. An addendum to the Agreement dated May 21, 2020 (the "Addendum") was thereafter executed whereby HSUS agreed to "take full [financial] responsibility" for all costs associated with shipping product purchased by HSUS. A true and correct copy of the Addendum is attached hereto as Exhibit 2, and incorporated herein by this reference.

9. As set forth more fully below, however, events would soon reveal that the business model HSUS employed was that of a classic "Ponzi scheme," whereby HSUS would use the money deposits paid by certain customers to pay for additional product it had ordered, or for shipping, and so forth, all for *other* customers. Thus, as Raybar was to learn, HSUS had no capital or funding, nor any shipping arrangements in place to move product once procured. Indeed, about the only thing HSUS had in abundance was empty promises, the type that failed to fulfill the terms of the Agreement, or move to market the PPE supplies desperately needed by the medical community and First Responders around the country.

10. Aside from the inadequate payments made in the hopes of mollifying Raybar, Plaintiff is informed and believes, and thereupon alleges, that HSUS is currently indebted to Raybar in an amount exceeding Six Hundred and Fifty Thousand Dollars ($650,000) and perhaps as much as One Million Dollars ($1 million), or more. The proper sum owing to Raybar can only be determined by an accounting but, despite the terms of the Agreement and numerous demands therefor, HSUS has failed to provide Plaintiff with same (other than a somewhat cryptic piece of paper), and the trickle of payments forthcoming from HSUS has recently dried up altogether.

### Jurisdiction and Venue

11. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332 (a)(1), because this is a civil action where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between the citizens of different States.

12. Venue is properly set in this District pursuant to 28 U.S.C. §1391 (b), because the Defendant maintains its principal place of business here and transacts business within this judicial district. Further, pursuant to the terms of the parties' written agreement (the "Agreement") (see ¶17, p. 4, Exhibit 1 hereto), Los Angeles County and, in particular, the Federal Court, Central District, located therein, was designated as the proper venue for any action arising out of the Agreement.

13. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, the Court has personal jurisdiction over the Defendant, because Defendant maintains its principal place of business in Los Angeles County, California, such that requiring an appearance before this Court does not offend traditional notions of fair play and substantial justice. Moreover, Defendant maintains its registered agent for service of process in the State of California. Finally, pursuant to the terms of the Agreement (see ¶17, p. 4, Exhibit 1 hereto), all parties knowingly and voluntarily waived any objection based on the grounds of a lack of *in personam* jurisdiction.

### The Parties

14. Plaintiff Raybar Pte Ltd is a Singapore private limited company, organized and existing under the laws of the Country of Singapore, with its principal place of business located in Singapore. Among other things, Plaintiff is engaged in business consulting, across a wide variety of disciplines including, but not limited to, marketing, commodity distribution and media.

15. At all times herein mentioned, Defendant Health Supply US, LLC ("HSUS" or "Defendant"), is a limited liability corporation, organized and existing under the laws of the State of Delaware, with its principal offices located in Los Angeles County, State of California. HSUS is primarily engaged in the business of buying and then re-selling Personal Protective Equipment ("PPE"), taking advantage of the COVID-19 crisis gripping this nation and the world.

///

16. Plaintiff is informed and believes, and thereupon alleges, that HSUS is a limited liability corporation consisting of three members, Christopher Garcia, a 32-year-old man residing in Washington, D.C., his father Cesar Garcia, who is based at the company's headquarters in North Hollywood, California, and David Malloy, who at all times relevant hereto was based in the State of North Carolina.

17. Christopher Garcia is the managing member of HSUS. Plaintiff is informed and believes, and thereupon alleges, that Christopher Garcia is associated (as a "consultant") with an organization called "The Livingstone Group," a Washington D.C. based lobby organization which, according to its website, specializes in "government relations, international relations/business development, general public affairs counsel and strategic marketing services." (hereinafter, "Livingstone") (see https://www.livingstongroupdc.com).

18. Although Plaintiff is informed and believes, and thereupon alleges, that the rules of protocol do not provide for it, Christopher Garcia identifies himself as the "Hon. Chris Garcia" on his online Livingstone biography. (see https://www.livingstongroupdc.com/about/bios/chris-garcia/). Indeed, Christopher Garcia's boasts about these apparent high-level Washington connections played a major role in securing Raybar's consent to contract with HSUS.

19. Plaintiff is informed and believes, and thereupon alleges, that a second member of HSUS is Christopher's father, Cesar Garcia, who is based out of the company's headquarters in North Hollywood, California. According to his CV, Cesar Garcia has spent his career in a variety of fields, from printing, to import/export, and currently, an amorphous specialization in "business development."

20. The third and final member of HSUS is David Malloy, currently believed to be based in North Carolina. Plaintiff is informed and believes, and thereupon alleges, that Mr. Malloy acts as the COO of HSUS. A review of Mr. Malloy's CV indicates that he has spent his career principally as an executive recruiter for many large high-end technology companies.

21. Prior to the creation of HSUS, Plaintiff is informed and believes, and thereupon alleges, that none of its members had any relevant experience in the acquisition and distribution of medical equipment and/or supplies in the first instance, and certainly not on a mass scale.

5
COMPLAINT FOR DAMAGES

## Facts Relevant to All Causes of Action

22. In or about late March 2020, Mr. Granger Whitelaw, Raybar's CEO, was approached by an acquaintance who was working with a group looking to sell PPE to U.S. hospitals, universities, FEMA, and the like. In particular, Mr. Whitelaw's acquaintance was seeking help finding sourcing factories for PPE in Vietnam. Given that it afforded Raybar the opportunity to participate in the global fight against COVID in a concrete and meaningful way, Mr. Whitelaw was immediately drawn to the project.

23. Soon thereafter, Raybar met with the principals of HSUS, and the parties agreed to enter into a commission-based Finder's Fee Agreement (Exhibit 1 hereto), structured so as to take advantage of Raybar's sourcing expertise. In this regard, Raybar would introduce HSUS to potential suppliers and/or manufacturers of PPE, and then HSUS would endeavor (at its discretion) to complete the transaction. Pursuant to Paragraph 3 of the Agreement (and as referenced above), Raybar was to be paid a 20% commission, calculated on the difference between what the PPE supplies cost HSUS to secure, and the price at which HSUS then sold the items to its end user customers.

24. Raybar's sourcing activities were primarily (but not exclusively) focused on the procurement of disposable medical gowns (the "gowns") for use in hospitals and medical facilities. Early on, Raybar was able to compile a roster of approximately 50 Vietnamese factories with the potential to manufacture the gowns, including a company by the name of Viet Thanh Garments, a very large manufacturing concern which would ultimately provide most of the gowns purchased by HSUS.

25. In short order, HSUS began procuring orders for gowns (the first one, for 790,000 pieces), from organizations such as the University of Indiana and Wake Forest Baptist Medical Center, and Hubert, a large company that sells medical products across the United States. Other HSUS customers included the City of Lancaster, Hudson Regional Hospital, Parkview Health, along with Ohio State University, and the University of Maryland. These were all significant sales, and the venture seemed quite promising.

///

26. When new orders came in, HSUS would receive substantial cash deposits from its customers. Yet, whenever Raybar asked for the funds needed to pay for shipping the product (which funds would presumably be coming out of the final payments received by HSUS), there was almost always great hesitation on the part of HSUS. Obviously, sales, standing alone, were irrelevant unless HSUS was able to actually get the product in the hands of its customers.

27. There was, however, one problem: HSUS had not made *any* arrangements for shipping the product it purchased prior to embarking on this venture with Raybar. Here was a company, comprised of three supposedly sophisticated businessman, which had embarked on an enterprise to obtain and sell critically needed medical equipment in the midst of a global pandemic, *without any consideration* given as to how to actually move millions of pieces of product from S.E. Asia to America. Such oversight was (pun intended), nothing short of titanic.

28. More than a little surprised, Raybar nonetheless stepped into the breach, and took immediate steps to rescue HSUS, its orders of PPE, as well as Raybar's own commissions and valuable business relationships and reputation. Calling on its own connections, Raybar thus arranged for shipping to be provided by Maersk, one of the world's largest shipping companies. The first PPE shipments went out.

29. No doubt embarrassed, HSUS insisted on handling the next shipment through a friend of Christopher Garcia, who was purported to have significant experience with shipping and logistics. The second shipment went out, but did so with Christopher Garcia apparently assuming that HSUS would be able to secure payment terms from the new shipper. He was wrong.

30. In fact, the shipper arranged by HSUS, angry by the lack of payment, ended up holding the product for a number of weeks, meaning that PPE that was badly needed at various distribution points languished at the docks instead. This small disaster then inevitably snowballed, and soon enough revealed the truth behind Defendant's amateurish scheme.

31. In short, HSUS had no funding. First, no shipping, and then, no financing. HSUS' "business plan," therefore, such as it was, had been to take large cash deposits from customers, and use those funds to pay for raw or finished materials. At that point, HSUS would find itself hoping to take in additional deposits from *other* customers, sufficient to pay for

shipping, or to make payments needed to finish existing product orders, or to pay for the original gowns already ordered. Or to pay commissions.

32. Without question, companies commonly use cash flow to run their businesses. But to commence operations of the scope contemplated by HSUS – without capital, funding or financing of any kind – turned its entire PPE enterprise into a classic Ponzi scheme. Here, without any notice to its customers, HSUS was taking money (in the form of a "deposit") from one institution or hospital, and then using those funds to pay for the gowns ordered by another hospital, or to finance the shipment of goods from yet a different institution, and so forth. Plaintiff is informed and believes, and thereupon alleges, that had the hospitals and other HSUS buyers known that their supply of PPE was balanced on the slenderest of reeds, they would have taken their business elsewhere.

33. Faced yet again with a fundamental failing on the part of HSUS, one which threatened the entire enterprise, Raybar went out itself and arranged for a significant credit facility with a large shipping concern, one with which it had good relations. Raybar's parent company signed for the credit facility, and the obligation would be listed on Raybar's own company credit line. In return, HSUS agreed in writing to pay down the debt on Raybar's behalf, in a timely fashion. *See* Exhibit 2. Thus, first in the case of shipping, and now in the matter of financing, HSUS' complete lack of corporate governance and/or business wherewithal forced Raybar – even while it was under no obligation to do so – to provide, on the fly, the essential infrastructure HSUS was so sorely lacking.

34. The infusion of cash from the Raybar credit line allowed HSUS to start plugging the gaps caused by the collapse of its Ponzi scheme. The next shipment of products went out by air (in order to limit further delay), and then into the hands of the Universities who had been waiting a LONG time to get their PPE. These customers released the final payments they had been holding back, which payments were then used by HSUS to pay for the *previous* shipment of gowns that were still being held by the other shipping company which it had been retained (*see* ¶¶ 30-31, above). Finally, the gowns being held in port were released and then sent to yet *other* buyers who had ordered gowns, paid deposits, but were holding onto *their* final payments

until completion of delivery. And so finally, if any money was left over, HSUS would theoretically attempt to pay Raybar's commissions and credit facility, and monies owed to other third parties.

35. In this fashion, HSUS was always playing "catch up," instead of staying ahead. As evidenced by numerous emails and text messages, HSUS admitted to, and apologized for, its ongoing mistakes, but the misrepresentations continued: Product promised and not delivered, commission payments owed, but not received. And all the while, Raybar was placing its good name and reputation on the line, getting PPE product at the best prices, and ahead of schedule.

36. Not surprisingly, HSUS' utter disregard for basic corporate practices had a dramatic effect on Raybar's recipt of commissions. Thus, under the terms of the Agreement, it was Raybar's responsibility to get products sent to whatever port HSUS instructed, and then assist HSUS with whatever directions or advice it required. Indeed, the Agreement states as much, but makes equally clear that the ultimate responsible party is HSUS. Raybar always kept its end of the bargain.

37. Further to the contract, 30 days after the gowns (or other goods) reached port (usually located in Ho Chi Mihn City), Raybar was entitled to the payment of its commission. Moreover, HSUS was also obligated to provide Raybar with monthly statements (see Agreement, at ¶3), reflecting the amount and the manner of the calculation of Raybar's commissions.

38. Yet despite near constant requests (many in writing), HSUS never seemed capable (or willing) to provide the required accountings. What Raybar got instead was excuses. HSUS would say (or write) things like, "Oh, we just hired somebody," or "we are interviewing a new accountant," or "we're just hiring a new firm, and it should be there in a week." All lies.

39. Indeed, considering the circumstances – with Raybar going *way beyond* what was required to provide HSUS with shipping, a credit facility, and quality PPE at competitive prices -- HSUS would have shown a modicum of "good faith" by providing the contractually mandated accountings. After all, counting the pieces sold and then calculating a 20% commission was not exactly rocket science. Nonetheless, despite numerous requests therefor, no accountings were forthcoming, other than a single piece of paper received sometime in September 2020.

40. As for the actual *payment* of such commissions, the three principals of HSUS took turns making empty promises to Raybar, such as "we'll send you one hundred grand," or "we'll pay you $50,000 a week until the 'big money' comes in." All this, mind you, at a time (June 2020) when HSUS already owed Raybar *over $1 million!*

41. The principal reason for these deficiencies, the absence of accountings, the lack of commission payments, finally became somewhat clearer on or about June 26, 2020, during a telephone conversation between Raybar and Cesar Garcia. Thus, according to Cesar, HSUS was "out of money." Inconceivably, then, after delivery of over a million gowns, and the collection by HSUS of an untold number of deposits from major institutions, it somehow had managed to run out of funds? In retrospect, the only explanation which seems to make sense is that the deposits gathered up by HSUS were no longer sufficient to cover its expenses. Either gross corporate mismanagement, then, or looting.

42. After considerable back and forth, HSUS promised Raybar, on or about July 3, 2020, that HSUS would begin a payment schedule of a *minimum* of $50,000 per week until Raybar's principal payment could be paid out. HSUS did in fact begin to remit to Raybar the sum of $50,000 a week, but it did not come close to making Raybar whole. In or about August 2020, Raybar – understandably frustrated – reminded HSUS that it had not even provided the requisite accounting which would have permitted Raybar to properly calculate the exact amount it was owed. Particularly frustrating, therefore, was the fact that as of this time, HSUS should have received all of the principal payments from the Hospitals/Institutions that they had been waiting on.

43. Still nothing. Worse, Cesar suddenly stopped communicating altogether, followed in turn by David and Christopher. A few more unlikely excuses actually followed, and then all payments and communication stopped completely. Based on incomplete figures that the company ultimately provided, HSUS apparently contends that Raybar generated $1,361,401.52 in commissions, has already been paid $723,000, leaving a balance owing of $633,406.52. Raybar, however, subject to a proper forensic accounting, is informed and believes and thereupon alleges that it is owed at least $650,000, and perhaps even more than $1 million. It is well documented

that domestic demand for PPE has far outstripped supply, and that supply has been needlessly curtailed by red-tape, political theater, and product mismanagement. Raybar wanted to be a part of the solution. HSUS, on the other hand has been, and remains, part of the problem.

### III.

### FIRST CAUSE OF ACTION FOR BREACH OF WRITTEN CONTRACT

### (Against Defendant HSUS)

44. Plaintiff repeats, realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 43, above.

45. As alleged above, Plaintiff and Defendant entered into the Finder's Fee Agreement in April 1, 2020. Since that time, Raybar has gone overboard to assist HSUS, bringing to it all of the suppliers and/or manufacturers that HSUS required to complete its sales. Indeed, and as set forth more fully above, Raybar then went *well beyond* the call of duty, arranging shipping for HSUS at a time when the entire enterprise threatened to be rendered stillborn, and then providing HSUS access to a credit facility that Raybar took out in its own name.

46. Plaintiff has performed all of the terms, conditions and covenants required on its part to be performed under the Agreement, as set forth above, except for those obligations excused by Defendant's prior material breaches of contract. Defendant HSUS, on the other hand, has breached the Agreement by failing to pay commissions when due, defaulting on its promises to at least make partial payments until the full sum owing could be satisfied, and failing to provide Raybar with monthly accounting statements.

47. As a direct and proximate result of Defendant's repeated breaches of the Agreement and its failure to pay commissions when owing, Plaintiff has suffered actual damages in an exact amount to be determined at trial, but in any event in excess of this Court's jurisdictional limits. Plaintiff is also entitled to prejudgment interest at the highest legal rate.

IV.

**SECOND CAUSE OF ACTION; MONEY HAD AND RECEIVED**

(Against Defendant HSUS)

48. Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in Paragraphs 1 through 47, above.

49. As set forth above, Defendant HSUS, received money that was intended to be used (at least in part) for the benefit of Plaintiff Raybar.

50. The money in question was not used for the benefit of Plaintiff Raybar.

51. Defendant HSUS has not given the money in question, intended for the benefit of Plaintiff Raybar, to Plaintiff Raybar.

VI.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. For actual damages to be proven at trial;
2. For prejudgment interest at the highest legal rate;
3. For costs of suit and attorneys' fees incurred herein;
4. For an accounting of all sales made by Defendant and commissions paid and owing to Plaintiff; and
5. For any other legal and equitable relief as the Court deems just and proper under the circumstances.

Date: October 16, 2020

BERKESLAW

By: _____
Attorneys for Plaintiff