# EXHIBIT 1

## FINDER'S FEE AGREEMENT

This Finder's Fee Agreement ("Fee Agreement") effective as of his 1st day of April 2020 ("Effective Date") is entered into by and between Raybar Pte Ltd, with a place of business located at 20A Tanjong Pagar Road, Singapore, 088443("Broker"), and Health Supply US, LLC, with its principal place of business located at 11126 Morrison Street Unit 1, Los Angeles, CA 91601 ("HEALTH SUPPLY"). Broker and HEALTH SUPPLY may each be referred to as a "Party" and collectively as the "Parties".

1.       **Retention of Broker**.  Subject to the terms and conditions set forth in this Fee Agreement, HEALTH SUPPLY hereby retains the Broker to perform certain supplier prospecting services in connection with certain of HEALTH SUPPLY 's commercial activities.  HEALTH SUPPLY, pursuant to its course of business, from time to time enters into transactions for the purchase and sale of personal protective equipment and other Supplies ("Supplies").  Broker has knowledge and expertise with respect suppliers of Supplies and may from time to time present to HEALTH SUPPLY potential transactions for HEALTH SUPPLY to purchase Supplies, which HEALTH SUPPLY may enter into or decline to enter into in its sole discretion.  Broker hereby accepts this retention on the terms and conditions set forth in this Fee Agreement.

2.       **Scope of Services**.  Broker shall perform all the sourcing services described in this Agreement, as further elaborated in the Services Level Agreement attached hereto and incorporated herein as **Exhibit "A"**. The services to be performed by Broker include presenting Healthy Supply with potential transactions ("Transactions") for HEALTH SUPPLY to purchase Supplies from a particular manufacturer or supplier ("Suppliers") of such Supplies at particular quantities and prices. Broker may facilitate negotiations between HEALTH SUPPLY and Suppliers but shall have no authority to bind the Supplier or HEALTH SUPPLY in such negotiations or with respect to any other obligations.  Broker shall not represent to Suppliers (or any third party) that it has the authority to bind HEALTH SUPPLY in such negotiations or with respect to any other obligations. Broker will endeavor to identify new potential Transactions for HEALTH SUPPLY to purchase Supplies; however, HEALTH SUPPLY shall have the right to determine, in its sole discretion, whether to pursue any Transaction identified by Broker.

3.       **Compensation and Payment.**  At the time that HEALTH SUPPLY informs Broker that it will pursue a potential Transaction presented by Broker, HEALTH SUPPLY shall communicate to Broker the price at which HEALTH SUPPLY intends to resell the Supplies to the Health Supply customer(s).  Broker's compensation ("Finder's Fee") for each Transaction presented to HEALTH SUPPLY by Broker and entered into by HEALTH SUPPLY shall be equal to 20% of the difference between (a) the price at which HEALTH SUPPLY sells the Supplies to its customer and (b) the total cost for HEALTH SUPPLY to purchase the Supplies.  The Broker's consummation of a Transaction constitutes Broker's conclusive acceptance of the calculation of the Finder's Fee communicated by HEALTH SUPPLY at the time that HEALTH SUPPLY informed Broker that HEALTH SUPPLY would pursue the Transaction. HEALTH SUPPLY shall provide a monthly statement reflecting the calculation of Finder's Fees for each month, including purchase prices of Supplies and gross sales prices to Health Supply's customers for all transactions occurring in that calendar month. If required for HEALTH SUPPLY 's accounting system, HEALTH SUPPLY may request that Broker submit an invoice reflecting calculation of the Finder's Fee, which Broker must submit at the time of HEALTH SUPPLY 's execution of the Transaction.

HSUS: _CAB_   BROKER: _6W_



4. **Timing of Delivery**. When HEALTH SUPPLY enters into a Transaction presented by Broker, Broker shall be responsible for monitoring that the Supplier delivers the Supplies that are the subject of the Transaction to HEALTH SUPPLY by the delivery deadline agreed to by Healthy Supply and the Supplier.

5. **Payment Contingent**. The Finder's Fee for each Transaction shall be due to Broker no later than thirty (30) after the date that HEALTH SUPPLY receives the supplies at the agreed port, warehouse, airport, or other place HEALTH SUPPLY instructs the Supplier and Broker to deliver the Supplies, on a per transaction basis, including in Vietnam, China or wherever the Supplies are being delivered per the terms of the transaction.

6. **Pre-existing Relationship with Supplier**. If Broker presents a potential Transaction to HEALTH SUPPLY with a Supplier from whom HEALTH SUPPLY has previously purchased Supplies, Broker shall not be entitled to any fee or compensation for any purchases made by HEALTH SUPPLY from such Supplier.

7. **New Relationship with Supplier**. If Broker presents a potential Transaction to HEALTH SUPPLY with a Supplier from whom HEALTH SUPPLY has not previously purchased Supplies, Broker shall be entitled to a Finder's Fee on any Supplies purchased by HEALTH SUPPLY from such Supplier, in perpetuity, unless this contract has been terminated. For purposes of this paragraph, the date of purchase shall be the date that an order for Supplies is submitted by HEALTH SUPPLY to the Supplier.

8. **Term**. This Agreement shall remain in effect for a period of Five (5) years from the date of this Fee Agreement unless terminated earlier pursuant to Section 9; provided further that the Parties' obligations pursuant to Sections 11, 12 and 13 shall survive and remain in force and effect for two (2) years from the date of this Agreement. The Term of this Finder's Fee may be extended as mutually agreed upon in writing by the Parties.

9. **Termination.** Each of the Parties shall have the right to terminate this Agreement for its convenience, in whole or in part, at any time, upon ninety (90) days' written notice to the other Party. In addition, HEALTH SUPPLY may immediately terminate this Fee Agreement upon the occurrence of any of the following events, although HEALTH SUPPLY shall pay all Finder's Fees due and owing pursuant to Section 3 of this Fee Agreement:

   (a) Broker has been charged and convicted of a Felony in any jurisdiction applicable to Broker or HEALTH SUPPLY;
   (b) Broker ceases to actively prospect for and/or consummate the type of transactions contemplated by this Finder's Fee Agreement.

10. **Independent Contractor**. Broker agrees to perform these activities as an independent contractor and not as a subcontractor, agent or employee of HEALTH SUPPLY or its subsidiaries or affiliates. HEALTH SUPPLY retains no control or direction over Broker over the detail, manner or methods of performance of these activities. Broker is not granted any right or authority, or responsibility expressed, implied or apparent on behalf of or in the name of HEALTH SUPPLY to bind or act on behalf of HEALTH SUPPLY.

2

HSUS: _C4b_ BROKER: _bw_

11.   **Confidential Information**. Confidential Information marked as such by HEALTH SUPPLY shall not be used by Broker for any purpose other than to perform services under this Fee Agreement. Confidential Information shall be held in strict confidence and shall not be disclosed to any third party without HEALTH SUPPLY 's prior written mutual consent.

12.   **Publicity**. Broker nor HEALTH SUPPLY shall release any press releases about the other party without the prior written approval of the other party. Neither party shall make any public disclosures regarding the other party or its activities except as necessary in the development and presentation of a potential Transaction for HEALTH SUPPLY to purchase Supplies.

13.   **Anti-bribery**. Broker and HEALTH SUPPLY agrees that they will not violate any applicable anti-bribery laws. Without limiting the foregoing, the parties agree that they will not, directly or indirectly, pay, promise or offer to pay, or authorize the payment of any money or anything of value to (including a "grease," "expediting" or facilitation payment): (i) an officer, employee, agent or representative of any government, including any department, agency or instrumentality of any government or any government-owned or government controlled entity or any person acting in an official capacity on behalf thereof; or (ii) a candidate for political office, any political party or any official of a political party; or (iii) any other person while knowing or having reason to believe that some portion or all of the payment or thing of value will be offered, given or promised, directly or indirectly, to any person described above; in each case under clause (i), (ii) or (iii), for the purpose of influencing any act or decision of such government official, political party, party official, or candidate in his or its official capacity, including a decision to do or omit to do any act in violation of the lawful duty of such person, or inducing such person or entity to use his or its influence with the government or instrumentality thereof to affect or influence any act or decision, for the benefit of HEALTH SUPPLY or Broker.

14.   **Modifications**. No amendment or modification to this Fee Agreement shall be effective unless made in writing.

15.   **Assignment.** This Fee Agreement and all of Broker's rights, duties and obligations under this Fee Agreement are personal in nature and shall not be assigned, delegated or otherwise disposed of by Broker without the prior written consent of HEALTH SUPPLY, unless to another legal entity that Granger Whitelaw is a majority shareholder, or to him personally, or any trust he controls. However, HEALTH SUPPLY may at any time and at its sole and unrestrained discretion assign this Fee Agreement, in whole or in part, to one of its subsidiaries or affiliates by written notice to Broker. No assignment or transfer of this Fee Agreement shall relieve either Party of any of its obligations hereunder until such obligations have been assumed by the assignee and agreed to by HEALTH SUPPLY, Broker and assignee. If this Fee Agreement should be permitted to be assigned by either Party pursuant to the terms of this Fee Agreement, it shall be binding upon and shall inure to the benefit of the permitted assignee.

16.   **Liability Limitation**. In any legal proceeding between the parties, the liability of shall be limited to the amount of any Finder's Fees owed by HEALTH SUPPLY to Broker. In no event shall either party be liable to the other, in contract, tort or otherwise for payment of any special, indirect, incidental, consequential, exemplary, punitive or similar damages, including but not limited to lost profits.

17.   **Governing Law and Jury Waiver**. This Fee Agreement shall be construed in accordance with and governed by the laws of the State of California, without giving effect to its

3

HSUS: _CAG_   BROKER: _GW_

conflict of laws provisions. In the event of litigation arising hereunder, the Parties agree that the exclusive venue for such litigation shall be in the United States District Court for the Central District of California or, if such court does not have jurisdiction, then the state court of the State of California with jurisdiction over Los Angeles County, California, to the exclusion of all other courts and forums. The Parties irrevocably waive any objection, which any of them may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdiction, including any objection to the laying of venue based on the grounds of forum non convenience and any objection based on the grounds of lack of in personam jurisdiction. Each Party knowingly, voluntarily and intentionally waive the right to a trial by jury with respect to any litigation based or arising out of, under or in connection with this Fee Agreement.

18.    **Exclusivity**. Broker hereby agrees that, during the term of this Agreement, it shall not, directly or indirectly, perform services similar to the services performed under this Agreement for any person or entity other than HEALTH SUPPLY.

19.    **Non-Competition.** The Principals and all companies Broker has control of shall not, directly or indirectly, compete with the business, clients or Products of HEALTH SUPPLY. A company will be deemed to be related to the Broker (i) if the company is, directly or indirectly, in whole or in part, owned by all or any one of the Principals, or has a business or contractual relationship with a member of the Broker; or (ii) if the company is directly or indirectly, in whole or in part, owned by an owner, director, officer, employee or agent of any member of the Broker or a family member of an owner, director, officer, employee or agent of any member of the Broker. This non-compete obligation is effective for the Term of the Agreement and for two (2) years after any expiration or termination of the Agreement.

20.    **Transparency.** Broker will allow total transparency of its procurement process and costs, including identity of Suppliers, any direct or indirect financial relationships with Suppliers, purchasing or other local incentives provided by raw material suppliers, factories, local governments, or any person or entity involved directly or indirectly in HEALTH SUPPLY 's supply chain as it relates to its direct business with HEALTH SUPPLY,. Broker shall facilitate direct contact between HEALTH SUPPLY and Suppliers as needed to consummate Purchase orders and deliveries of supplies.


IN WITNESS WHEREOF, the duly authorized representatives of the Parties have executed this Fee Agreement effective as of the Effective Date first above written.

**HEALTH SUPPLY US, LLC:**                          **BROKER:** Raybar PTE LTD

Signature:                                          Signature:

Printed Name: CHRISTOPHER GARCIA    Printed Name: Grangar B. Whitelaw

Title: MANAGING MEMBER                 Title: CEO

Date: MAY 15, 2020                              Date: May 15, 2020

4

HSUS: CAG    BROKER: GW

**Exhibit "A"**
**SERVICES LEVEL AGREEMENT**

**THIS SERVICES LEVEL AGREEMENT** (the "SLA"), is an exhibit to the **SOURCING SERVICES AGREEMENT** of the same date.

**Article 1. Sourcing Services; Contracts with Suppliers**

1.1 **Outline of Sourcing Services**. For purposes of this SLA, all references to BROKER shall collectively refer to GRANGER WHITELAW, RAYBAR PTE LTD, THE VIETNAM GROUP, AND ALL AFFILIATES IT CONTROLS. For and on behalf of HEALTH SUPPLY, BROKER shall:

(a) Identify, interview, select and recommend factories suitable for the manufacture of Product after conducting reasonable financial and business due diligence on each Supplier, factory, owners, directors and officers (all due diligence results shall be provided to HEALTH SUPPLY in writing);

(b) Solicit bids and negotiate the most favorable terms and best prices for the Product; and deal directly with the factories and avoid going through agents;

(c) Solicitation for bids and negotiations shall take place after: (i) Supplier due diligence has been completed, resulting in a favorable assessment on Supplier; and (ii) a confidentiality agreement, using the form confidentiality agreement set forth by HEALTH SUPPLY has been signed by the target Supplier;

(d) Monitor the manufacture, inspection, packing and shipment of Product;

(e) Monitor compliance and performance of each Supplier and timely deliveries with each PO and all the terms and conditions of the Supply Contract;

(f) Monitor quality assurance with each Supplier and report any deficiencies.

(g) Assist supplier in obtaining documentation necessary for the exportation of the Product in Country of Origin and importation of Product to the United States or other country, clearly specifying the country of origin and destination;

(h) Provide HEALTH SUPPLY with the relevant Supplier's original invoices for Products, it being understood that BROKER will never act as a seller of any Product to HEALTH SUPPLY;

(i) Maintain complete and accurate records of all Products ordered, in progress, finished and in transit for the account of HEALTH SUPPLY and, at the request of HEALTH SUPPLY, provide HEALTH SUPPLY with access to and copies of the records;

5

HSUS: _____ BROKER: _____

### Article 2. Supply Chain Requirements

2.1 **PO and Acknowledgement**. HEALTH SUPPLY will issue and submit fax or electronic purchase orders to Supplier and BROKER.

2.2 **Production Closures**. BROKER shall to its best ability, provide HEALTH SUPPLY with annual calendars indicating Country of Origin holidays and other closures that may affect production or communication with the Suppliers, and will provide at least thirty (30) days advance notice, in writing, of any changes to this calendar.

2.3 **Packaging List**. BROKER shall monitor and ensure that each Supplier provides a packaging list with HEALTH SUPPLY purchase order number, HEALTH SUPPLY'S item number, quantity shipped, and date shipped with each shipment. If applicable, the packaging list should also provide serial number, lot or batch number, NDC or UPC number if available by supplier, and expiration date. Except for combined contain loads, there should be no more than one HEALTH SUPPLY purchase order number per Supplier packaging list, and all packaging lists should be printed in HEALTH SUPPLY part number sequence indicating split shipments and backorders, as applicable, so long as HEALTH SUPPLY provides this information.

2.4 **Packing and Labeling**. BROKER shall monitor and use its best efforts to ensure that each Supplier (i) preserves, packages, handles, and packs Products so as to protect the Products from loss or damage, in conformance with good commercial practice, government regulations, and other applicable requirements; (ii) marks the exterior of the boxes with the associated HEALTH SUPPLY item number and serial number, lot or batch number, NDC or UPC number as applicable, of the contents; (iii) provides this information on the exterior of the boxes in bar-code format; (iv) ships Products as specified by HEALTH SUPPLY so long as HEALTH SUPPLY provides this information

### Article 3. Forecasts, Production Schedules, and Quantity Variations

3.1 **Forecasts**. HEALTH SUPPLY shall provide to BROKER a forecast of the requests for proposal to source Products that HEALTH SUPPLY expects to order from Suppliers during each six-month period. The forecasts and updates furnished to BROKER shall be entirely non-binding and for planning purposes only.

3.2 **Production Schedule**. At HEALTH SUPPLY's request, BROKER shall use best efforts to arrange for the Suppliers to agree to schedule share and allow HEALTH SUPPLY to determine Suppliers' production schedule and to share materials, capacity or other information necessary to meet HEALTH SUPPLY's production needs.

3.3 **Quantity Variations**. If the quantity delivered varies from the quantity specified in a PO, then BROKER shall assist HEALTH SUPPLY with arranging Supplier to ship additional Products at the earliest possible moment and by the fastest practicable and available means, if the quantity delivered varies from the quantity supplied per the PO in question.

6

HSUS: _GAG_   BROKER: _GW_

## Article 5. Quality, Non-Conforming Products

5.1 **Quality**. BROKER shall, once a month while the any supplier is actively producing products for HEALTH SUPPLY under a valid PO, inspect for quality, condition and specifications of the Products at Supplier's factory and reject non-conforming Products.  Specifications adherence includes all accepted design drawings, renderings, artwork, specifications, models, samples, written procedures, or other guidelines for the Products, all as furnished, replaced, substituted, updated or amended by HEALTH SUPPLY or BROKER, as applicable.

5.2 **Non-Conforming Products**. For non-conforming Products, consult with HEALTH SUPPLY and instruct Supplier as to the means and methods of cure and cover.

5.3 **Random Quality Testing**. BROKER shall (i) reserve the right with each Supplier to select Product randomly during production or after arrival at the FOB, Port, Airport etc. before it ships to final destination at HEALTH SUPLPLIES instruction, to allow for for quality inspections by HEALTH SUPPLY, BROKER or third-party testing and to conduct random inspections during the production process to assure that the quality and workmanship of the Product in process strictly complies with the relevant approved samples and design and manufacturing specifications; (ii) promptly advise HEALTH SUPPLY in writing of any problems affecting the completion of POs for Product in accordance with the specified quality and delivery terms; and

## Article 6. Quality Assurance

6.1 **US FDA Compliance**. If required, BROKER shall reasonably assist Supplier to obtain and maintain appropriate certification status and compliance with the US Food and Drug Administration's (FDA) Quality System Regulation, the Medical Device Directive and all other applicable regulations.

6.2 **Country of Origin or Other Legal Compliance**. If applicable, BROKER shall reasonably assist Supplier to comply with all applicable Country of Origin laws, regulations, orders and standards that pertain to the Products or to the manufacturers of the Products.

6.3 **US Compliance by HEALTH SUPPLY**. Upon request, BROKER shall assist Supplier to furnish to HEALTH SUPPLY information required to enable HEALTH SUPPLY to comply with all applicable US law, regulations, orders and standards that pertain to the Products in the United States and to distributors for the Products.

## Article 7. Modification of Products

7.1 **Right to Alter Packaging**. BROKER shall assist in requesting the right for HEALTH SUPPLY to add notations or markings to the Product packaging after receipt of the Products.

7.2 **Changes to Products and Packaging**. BROKER shall facilitate communication with Supplier to consult with HEALTH SUPPLY on new Products and design changes or modifications to Products and the packaging.

7

HSUS: ____ BROKER: ____

7.3 **Notice of Discontinuance of Products**. BROKER shall assist to its best ability, Supplier to provide HEALTH SUPPLY with written notice of all Product discontinuance no less than sixty (60) days prior to the last order date.

### Article 8. Customs

8.1 **Country of Origin Certification**. Upon HEALTH SUPPLY's request, BROKER shall request that Supplier provide an appropriate certification stating the country of origin for Products, sufficient to satisfy the requirements of (i) the customs authorities of the country of ultimate destination; (ii) any applicable export licensing regulations, if any, including those of the United States; and (iii) requirements for duty drawback, if any.

8.2 **Export/Import Agent**. If the Products are being delivered FOB, FCA, FAS, CRF, CIF, CPT, CIP, DAF, DES, DEQ, DDU, as defined in Incoterms 2020, and the Supplier in question has no foreign trade right and has not named and import/export company to perform its obligations, BROKER shall act as the export agent, if BROKER is a properly licensed export/import company in Country of Origin.

8.3 **Export/Import Responsibility**. If the Products are being delivered FOB, FCA, FAS, CRF, CIF, CPT, CIP, DAF, DES, DEQ, DDU, as defined in Incoterms 2020, BROKER or Supplier, as the case may be, shall be the exporter of record and shall comply with all customs matters at origin. HEALTH SUPPLY or its designee shall be the importer of record and shall comply with all customs matters at destination.

8.4 **Documents for Customs Purposes**. Supplier shall use its best efforts to provide HEALTH SUPPLY or its designee with documentation deemed necessary by HEALTH SUPPLY or its designee to satisfy the requirements for customs benefits, US federal or state laws on domestic/foreign content, including country of origin information.

### Article 9. COMPLAINTS, QUALITY RECORDS AND RECALLS

9.1 **Complaints**. BROKER will notify, in writing, Supplier's quality assurance department of all Product complaints or any conformance issues that may affect the marketability of Products. BROKER shall assist in requesting Supplier to conduct safety investigations or other necessary follow-up activities. BROKER will provide information essential to such activities. BROKER or Supplier will promptly notify HEALTH SUPPLY when the corrective action has been completed.

8

HSUS: _CAG_  BROKER: _C_

# EXHIBIT 2

# Health Supply US

Your trusted source for medical and healthcare supply
+1 888-408-1694 • info@healthsupplyus.com

May 21, 2020

As an addendum to our Finder's Fee Agreement dated May, 2020, HEALTH SUPPLY LLC will take full responsibility for all air freight, ocean freight, handling charges, storage charges and any costs associated with shipping product from Vietnam or anywhere in the world, as requested by CONG THY RAYBAR GROUP COMPANY dba THE VIETNAM GROUP, RAYBAR PTE LTD or any of their affiliates, for any Purchase Orders or specific shipping contracts approved by Health Supply US, LLC in writing (including by email). Approval to ship on behalf of Health Supply US, LLC must be obtained on a purchase order by purchase order basis prior to authorizing any shipments."

Cesar Garcia
Health Supply US LLC
cgarcia@healthsupplyus.com

David Malloy II
Health Supply US LLC
dmalloy@healthsupplyus.com

11126 Morrison Street Unit 1 North Hollywood California 91601