Stephen G. Larson (SBN 145225)
*slarson@larsonllp.com*
R.C. Harlan (SBN 234279)
*rharlan@larsonllp.com*
Jennifer C. Cooper (SBN 324804)
*jcooper@larsonllp.com*
**LARSON LLP**
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Telephone:(213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Defendant and
Counter-Claimant HEALTH SUPPLY US, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| RAYBAR PTE LTD, <br><br> Plaintiff, <br><br> vs. <br><br> HEALTH SUPPLY US, LLC, a Delaware limited liability company, <br><br> Defendant. | Case No. 2:20-cv-09538-RGK-MAA <br><br> Hon. R. Gary Klausner <br><br> **DEFENDANT HEALTH SUPPLY US, LLC'S COUNTERCLAIM AGAINST PLAINTIFF RAYBAR PTE LTD.** |
| HEALTH SUPPLY US, LLC, a Delaware limited liability company, <br><br> Counter-Claimant, <br><br> vs. <br><br> RAYBAR PTE LTD., <br><br> Counter-Defendant, | |

LARSON LLP
LOS ANGELES

DEFENDANT HEALTH SUPPLY US, LLC'S COUNTERCLAIM AGAINST PLAINTIFF RAYBAR PTE LTD.

## COUNTERCLAIM

Defendant and Counter-Claimant Health Supply US, LLC ("HSUS"), by and through counsel, hereby asserts its Counterclaims against Raybar Pte Ltd.'s ("RPL") as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of HSUS's Counterclaims pursuant to 28 U.S.C. § 1367(a) because the Court has original jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332(a), and the Counterclaims are so related to the claims within such original jurisdiction that it forms part of the same case or controversy.

2. Venue is proper in this judicial district because the Federal District Court in the Central District of California was designated as the proper venue in the Parties' written agreement, which forms the basis of this Counterclaim.

3. This Court has personal jurisdiction over the Counter-Defendant Raybar Ptd Ltd. because all parties knowingly and voluntarily waived any objection to personal jurisdiction in this Court.

## PARTIES

4. Defendant and Counter-Claimant Health Supply US, LLC ("HSUS") is a Delaware limited liability company with its principal place of business in North Carolina. At all relevant times, a part of HSUS's business was procuring personal protective equipment abroad in order to import and distribute such personal protective equipment to the health care workers in the United States helping to combat the COVID-19 pandemic.

5. Counter-Defendant Raybar Pte Ltd. ("RPL") is an exempt private limited company incorporated under the laws of Singapore on March 6, 2019 with its principal place of business in Singapore. On information and belief, RPL, which designates itself as a management consultancy services company, consists of three members: (i) Granger Brewster Whitelaw, a United States citizen; (ii) Cas Anne

Brent Jens, a Netherlands citizen; and (iii) NG Cheng Wei, a Singapore citizen. At all relevant times, RPL held itself out as having knowledge and expertise in production, manufacturing and shipment of medical supplies from Asia to the United States.

## FACTUAL ALLEGATIONS

6.     At all relevant times, Granger Brewster Whitelaw ("Whitelaw") was the Chief Executive Officer and sole shareholder of RPL. On information and belief, Whitelaw founded RPL in March 2019 to help perpetrate his repeated and consistent pattern of fraudulent conduct.

7.     Throughout the United States, Whitelaw has profited off a pattern of fraudulent schemes under the guise of his various shell companies and "business" ventures. Put simply, Whitelaw is a career scam artist.

8.     Over the years, Whitelaw has been involved in several criminal and civil lawsuits stemming from his various fraudulent schemes. In 1999, the Department of Justice indicted Whitelaw for securities fraud, wire fraud, and conspiracy to commit securities and wire fraud in the Southern District of New York. *See United States v. Anton*, Case No. 1:99-cr-01019-RPP (S.D.N.Y. Sept. 30, 1999). In 2006, Whitelaw was accused of forcing Arizona-based company Engaging & Empowering Citizenship ("E2C") into Chapter 11 Bankruptcy after Whitelaw and his investment firms Blue Car Partners and Solition R&D failed to raise millions in promised investments for E2C's subsidiary Amber Alert Portal and defrauded E2C with a failed scheme to raise money through a public offering.[1] In 2010, Whitelaw and Blue Car Partners were then sued civilly for fraud in the Southern District of New York by Richard Selby, a former investor and employee, alleging that Whitelaw fraudulently induced him to purchase stock and defrauded

---

[1] *See* Webb, *Rocket CEO in Court Fight*, Albuquerque Journal (Mar. 27, 2006), available at https://www.abqjournal.com/biz/outlook/445405outlook03-27-06.htm.

him out of his $50,000 investment. *See Richard Selby v. Granger Whitelaw et al.*, Case No. 1:10-cv-07267-LTS (S.D.N.Y. Sept. 21, 2010).

9. A simple Internet search for Granger Whitelaw produces an unsettling amount of consumer reports written over the years by individuals across the United States who themselves were scammed by Whitelaw.[2] On information and belief, there are no limits as to who Whitelaw will scam or the situations Whitelaw will seek to take advantage of for his own economic gain. As one online consumer report stated, Whitelaw even tried to persuade an 83-year-old woman in Austin, Texas into investing in his fraudulent businesses.[3]

10. Considering Whitelaw's pattern of fraudulent activity, HSUS alleges, on information and belief, that RPL, at Whitelaw's direction, concocted a fraudulent scheme to take advantage of the COVID-19 pandemic. Unfortunately, HSUS fell victim to RPL's most recent scheme.

11. In or around March 2020, the United States experienced a severe shortage of personal protective equipment ("PPE") needed by healthcare workers fighting the COVID-19 pandemic, including a shortage of gloves, medical masks, googles, face shields and hospital gowns.

12. To help solve the shortage of PPE for frontline healthcare workers, HSUS began utilizing its resources and supply chain expertise to help import PPE into the United States. To do so, HSUS contracted with foreign entities who had

---

[2] *See, e.g.,* https://www.ripoffreport.com/reports/granger-whitelaw/internet-red-bank-nj-and-nyc-new-york-10174/granger-whitelaw-blue-car-partners-bluecar-partners-bluecar-blue-car-whitelaw-holdings-629804#comment_1 *and* https://ripoffscams.com/reports-filed/granger-whitelaw/nj-ny-nationwide/granger-whitelaw-blue-car-partners-bluecar-partners-bluecar-blue-car-whitelaw-holdings-inc-compulsive-liar-does-not-pay-for-services-rendered-fraudulently-deceived-investors-and-clients-inter/293392/.

[3] *See* https://ripoffscams.com/reports-filed/ggs/ggs-granger-whitelaw-scammed-me-austin-texas/81990/.

connections to manufacturers and suppliers of PPE abroad.

13. This, to HSUS's detriment, led to HSUS and RPL entering into business together.

14. At the time, HSUS reasonably believed that RPL was a legitimate business based on RPL and Whitelaw's misrepresentations that RPL (i) had connections to *quality* manufacturers in Vietnam who could quickly supply FDA-compliant PPE to the United States; (ii) that RPL had been heavily involved in brokering deals between manufacturers and supplies of PPE in Asia; and (iii) that RPL shared HSUS's same goal of helping United States frontline healthcare workers during the global crises.

15. On May 15, 2020, HSUS and RPL entered into a Finder's Fee Agreement ("Fee Agreement"), effective April 1, 2020. Attached to and incorporated in the Fee Agreement was the Services Level Agreement ("Services Agreement"), which described all the sourcing services RPL was contractually obligated to perform under the Fee Agreement. Attached as **Exhibit A** is a true and correct copy of the Fee Agreement and Services Agreement.

16. Under the Fee Agreement, RPL agreed to connect HSUS with manufacturers and suppliers ("Supplier") of PPE and present HSUS with potential transactions ("Potential Transaction") for HSUS to purchase PPE at particular quantities and prices from those Suppliers. (Fee Agreement, § 2.)

17. If HSUS, in its sole discretion, exercised its right to pursue a Potential Transaction presented by RPL, RPL would be compensated a Finder's Fee in an amount equal to twenty percent (20%) of the difference between (a) the price at which HSUS sells the PPE to its customer and (b) the *total cost* for HSUS to purchase the PPE. (Fee Agreement, § 3 (emphasis added).)

18. As set forth in the Fee Agreement, "[w]hen [HSUS] enter[ed] into a Transaction presented by [RPL], [RPL] shall be responsible for *monitoring* that the Supplier delivers the Supplies *that are the subject of the Transaction* to [HSUS] by

the delivery deadline agreed to by [HSUS] and the Supplier." (Fee Agreement, § 4.)

19. The Services Agreement set forth RPL's contractual obligations related to "monitoring" the Suppliers. Pursuant to the Services Agreement, RPL was contractually required, *inter alia*, to:

- "Monitor the manufacture, inspection, packing and shipment of Product" (Services Agreement, § 1.1(d));
- "Monitor compliance and performance of each Supplier and timely deliveries with each [Purchase Order] and all terms and conditions of the Supply Contract" (Services Agreement, § 1.1(e));
- "Monitor quality assurance with each Supplier and report any deficiencies" (Services Agreement, § 1.1(f)); and
- "[M]onitor and use its best efforts to ensure that each Supplier preserves, packages, handles, and packs Products so as to protect the Products from loss or damage, in conformance with good commercial practice, government regulations, and other applicable requirements" (Services Agreement, § 2.4.).

20. Under the Services Agreement, RPL was further required to ensure that the PPE produced by the Suppliers met the quality standards set forth by the United States Food and Drug Administration ("FDA") before it reached the frontline healthcare workers in the United States. (Services Agreement, §§ 6.1, 6.3.).

21. Pursuant to Section 5.1 of the Services Agreement, RPL "shall, once a month while any supplier is actively producing products for [HSUS] under a valid [Purchasing Order], inspect for quality, condition and specifications of the Products at Supplier's factory and reject non-conforming Products. Specifications adherence includes all *accepted* design drawings, renderings, artwork, specifications, models, samples, written procedures, or other guidelines for the Products, all as furnished, replaced, substituted, updated or amended by [HSUS] or [RPL], as applicable." (Services Agreement, § 5.1 (emphasis added).)

22. For non-conforming Products, RPL was obligated to consult with HSUS and instruct the Supplier as to the means and methods of cure and cover. (Services Agreement, § 5.2), and was also required to promptly advise HSUS in writing of any problems affecting the completion of Purchase Orders for Product in accordance with the specified quality and delivery terms. (*Id.*, at § 5.3.)

23. As detailed below, RPL woefully failed to meet its contractual obligations under the Services Agreement, causing HSUS to suffer losses in an amount not less than $2.2 million because of the non-conforming and defective PPE delivered to HSUS, which diminished HSUS's reputation and goodwill in the health care industry and negatively impacted the healthcare workers who were relying on effective, quality FDA-compliant PPE in their battle against the COVID-19 virus.

24. On information and belief, HSUS alleges that before entering the Fee Agreement and Services Agreement, RPL in fact never actually intended to monitor the suppliers it presented to HSUS or the PPE manufactured by those suppliers prior to sending the PPE to the United States.

25. Instead, RPL merely accepted the terms of the Services Agreement to induce HSUS to enter into the Fee Agreement with RPL so RPL could then fraudulently profit from the transactions HSUS entered into with RPL's presented suppliers, even though RPL knew or had reason to know that these suppliers were not manufacturing the quality of PPE necessary for HSUS to fulfill its customer orders.

26. As a result of RPL's own failures, the "total cost for HSUS to purchase the PPE" exceeded the "price at which HSUS sells the PPE to its customer," and RPL is therefore not entitled to any additional "Finder's Fee" payments under the Fee Agreement. In fact, HSUS actually overpaid RPL's commissions, considering that the majority of the transactions resulted in non-conforming, defective and insect-infested PPE unsuitable for use by the healthcare workers.

27. On April 9, 2020 and June 1, 2020, Indiana University Health Inc. ("IU

Health") entered into agreements with HSUS for the purchase of 500,000 large isolation gowns and 200,000 extra-large isolation gowns. These hospital gowns were supposed to be forty grams per square meter of 100% polyester and able to pass the American Association of Textile Chemists and Colorists ("AATCC") 22 splash proof test.

28. To fulfill IU Health's orders, HSUS entered into two purchase orders with Viet Thanh Garment Trading Joint Stock Company ("VTG"), a supplier that RPL presented to HSUS for this transaction.

29. On information and belief, HSUS alleges that RPL knew that VTG could not produce the quality of PPE necessary to meet the FDA's standards or otherwise fulfill HSUS's orders. Despite this knowledge, RPL presented VTG to HSUS as a Potential Transaction and represented that VTG would produce the PPE to the specifications required by United States law and the purchasing orders.

30. HSUS, relying on RPL's misrepresentations, entered into several purchasing orders with VTG for various items of PPE.

31. On information and belief, RPL fraudulently induced HSUS to enter into these purchasing orders with VTG for RPL's own financial gain while knowing full well that VTG could not manufacture the PPE ordered by HSUS or meet the quality control standards required before PPE is distributed to healthcare workers in the United States.

32. Pursuant to the Services Agreement, RPL was required to ensure that VTG delivered the correct quantity of the FDA-compliant isolation gowns in order for HSUS to meet its contractual obligations to IU Health. In addition, RPL was required to ensure that VTG packaged the gowns in conformance with good commercial practice and government regulations.

33. After receiving the isolated gowns manufactured by VTG, IU Health rejected and returned them to HSUS as non-conforming goods. In a letter dated October 30, 2020, IU Heath wrote to HSUS that the gowns—manufactured by VTG

under RPL's supervision—had thickness inconsistencies, were missing tie strings, and, worse yet, had whole and dismembered insects inside of the plastic wrap with the gowns. Upon HSUS's own investigation, HSUS also discovered that these hospital gowns, due to their poor quality, easily ripped, rendering them essentially useless to the healthcare workers who relied on the gowns to protect themselves from the COVID-19 virus.

34. At or around the same time HSUS entered into the purchase orders with VTG, again the supplier presented to HSUS by RPL, to fulfill IU Health's order, HSUS also entered into purchase orders with VTG on behalf of Wake Forest Baptist Medical Center ("Wake Forest") for 200,000 isolation gowns; The Ohio State University Wexner Medical Center ("OSU Health") for 100,000 isolation gowns; and University of Maryland Health ("U of M Health") for 100,000 isolation gowns.

35. Like IU Health, each of Wake Forest, OSU Health and U of M Health rejected the gowns manufactured by VTG under RPL's supervision as non-conforming goods after receiving complaints about the low-quality of the gowns' material and sewing, and that the healthcare workers would often find insects in them.

36. To remedy RPL's failures, HSUS either replaced the non-conforming gowns at its own expense or refunded the amounts paid, suffering damages in an amount to be proven at trial caused by RPL's fraudulent inducement and its failure to abide by its contractual obligations under the Services Agreement.

## FIRST COUNTERCLAIM

### (Breach of Contract)

37. HSUS re-alleged and incorporates by reference the allegations contained above in Paragraphs 1 through 36.

38. On or about May 15, 2020, HSUS and RPL entered into the Services Agreement, a valid written contract, under which RPL was contractually obligated to ensure that the PPE manufactured and shipped by the Suppliers it presented to

HSUS met both quality and FDA standards, and that the PPE was properly packaged by the Supplier before sent to the United States.

39. RPL breached the Services Agreement by failing to: (i) monitor the manufacture, inspection, packing and shipment of the isolation gowns sent by VTG to IU Health, Wake Forest, OSU Health and U of M Health, as evident by the poor quality of the gowns and the insects found inside the gowns and packaging; (ii) ensure quality assurance with VTG; (iii) report VTG's deficiencies to HSUS before the isolation gowns reached the United States; (iv) inspect the isolation gowns for quality, condition and specifications at VTG's factory; and (v) reject non-conforming isolation gowns before shipping them to the United States. (*See* Services Agreement, § 1.1, 2.4, 5.1.)

40. HSUS, as a result of RPL's breach of the Services Agreement, is excused from its obligations under the Fee Agreement, *namely*, HSUS is excused from remitting any further Finder's Fee payments to RPL because the "the "total cost for HSUS to purchase the PPE" exceeded the "price at which HSUS [sold] the PPE to its customer[s]" as HSUS has had to, at its own expense, replace the non-conforming gowns or refund the amounts paid by the customers.

41. As a direct and proximate cause of RGL's breach of the Services Agreement, HSUS has suffered damages in an amount exceeding $2.2 million with the exact amount to be determined at trial.

## SECOND COUNTERCLAIM
**(Fraudulent Inducement)**

42. HSUS re-alleged and incorporates by reference the allegations contained above in Paragraphs 1 through 36.

43. RPL, through Whitelaw, knowingly, voluntarily and intentionally induced HSUS to enter into the Fee Agreement despite the fact that at no point did RPL intend to perform the sourcing services—the services necessary to ensure the quality of the PPE delivered to United States healthcare workers—set forth in the

Services Agreement. Further, RPL, through Whitelaw, knowingly, voluntarily and intentionally induced HSUS to enter into purchasing orders with VTG, while knowing full well that VTG could not produce the quality of PPE necessary for HSUS to fulfill its orders or meet FDA standards.

44. HSUS justifiably relied on false representations made by RPL and Whitelaw before and during the negotiation of the Fee Agreement, including RPL and Whitelaw's false representations that it (i) had connections to *quality* manufacturers in Vietnam who could quickly supply FDA-compliant PPE to the United States; (ii) had been heavily involved in brokering deals between manufacturers and supplies of PPE in Asia; (iii) shared HSUS's same goal of helping United States frontline healthcare workers during the global crises; and (iv) that it would monitor and ensure the quality of PPE manufactured by its presented suppliers and supervise the packaging of the PPE before it was sent to the United States.

45. HSUS also justifiably relied on false representations made by RPL and Whitelaw about the quality of PPE manufactured by VTG before entering into the purchase orders with VTG.

46. RPL made these false representations with the intent to induce HSUS to enter into the Fee Agreement and purchase orders so RPL could fraudulently profit and collect Finder's Fees from HSUS's orders of non-conforming, low-quality, insect-infested PPE.

47. Had RPL not induced HSUS to enter into the Fee Agreement and the purchase orders with VTG, HSUS would not have incurred, in addition to the payments made to VTG for the defective PPE, the substantial costs related to picking up and replacing the defective PPE, the shipping of the replacement PPE, and refunding its customers for the defective PPE.

48. As a direct and proximate cause of RPL's misrepresentations, HSUS has sustained and will continue to sustain damages in an amount to be proven at

trial, which in no event shall be less than $2.2 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendant and award the following relief:

A. Actual damages presently estimated to be at least $2,200,000; including damages as a result of RPL's fraudulent misconduct;

B. Pre-judgment and post-judgment interest;

C. Costs incurred in this action; and

D. Any such other relief as the Court may deem just and equitable.

Dated: January 27, 2021           LARSON LLP

By: _____
Stephen G. Larson
R.C. Harlan
Jennifer C. Cooper
Attorneys for Defendant and Counter-Claimant
HEALTH SUPPLY US, LLC